## KATHERINE TOOMEY v. ROLLA WELLS, Receiver of United Railways Company, Appellant.

### Division One, October 9, 1925.

1. **NEGLIGENCE: Vigilant-Watch Ordinance: Relaxing Care Due Passengers: Intendment.** The Vigilant-Watch Ordinance of St. Louis, requiring a motorman of a street car to keep a vigilant watch for all persons on the track or moving towards it, and on the first appearance of danger to such persons to stop the car in the shortest time and space possible, exacts a higher degree of care on the part of the street railway company than the care imposed by the common law, and the purpose and intent of the law-making body in enacting it must be considered, and that object, like the humanitarian rule, was the better to safeguard and protect from injury persons on foot and especially children on or approaching the track; but it does not in any wise lessen or abrogate the safeguards the law throws around passengers who entrust their safety to the carrier, whose duty it is to exercise the highest degree of practicable care for the passenger's safety. In an effort to obey the Vigilant-Watch Ordinance, due regard must always be had for the safety of the passengers on the car which is stopped to avoid striking a pedestrian.

2. ———: ———: ———: **Question for Jury.** Whether the carrier, in an attempt to obey the Vigilant-Watch Ordinance, exercised due

Toomey v. Wells.

care for the safety of its passengers, depends upon the facts and circumstances of each particular case, and ordinarily is a question for the jury to determine. Where the street car had stopped at a cross street to receive passengers, and a pedestrian was approaching the track in front of the car, and the motorman, in an attempt to avoid striking her, after proceeding but a few feet, stopped the car so suddenly and unexpectedly as to throw down and seriously injure a passenger who had just entered and was proceeding up the aisle in search of a seat, the question whether the carrier, in so suddenly stopping the car under the circumstances, was exercising due care for the safety of such passenger, should be submitted to the jury.

3. ———: ———: ———: **Seen Approaching Track.** Where a witness for the defendant carrier testifies that, after the east-bound car which had stopped on the west side of a cross street to receive passengers and had proceeded only a few feet, a pedestrian, traveling on the cross-walk on the east side of the cross street, came from the south and nothing obstructed a view of her as she approached the track from the time she left the south curb line, the question whether the motorman, if he had been keeping a vigilant watch, should have seen her when the first appearance of danger occurred at the time she left the south curb line, and could then have brought his car to such a stop as to have avoided injury both to the pedestrian and a passenger who had just boarded the car, instead of stopping or beginning to stop only when the pedestrian was actually within or upon the track, are questions for the jury, where the car was stopped so suddenly and unexpectedly as to violently throw down and upon the front platform and against the stove the plaintiff passenger who had just entered the car and was proceeding up the aisle towards the front in search of a seat. In such case the question whether the carrier, in an effort to obey the Vigilant-Watch Ordinance and to avoid injury to the pedestrian, exercised due care for the safety of such passenger, is for the jury to determine.

Corpus Juris-Cyc. References: Carriers, 10 C. J., Section 1388, p. 976, n. 80 New; Section 1429, p. 1030, n. 16; Section 1465, p. 1075, n. 29, p. 1076, n. 36. Constitutional Law, 12 C. J., Section 375, p. 871, n. 65; Section 387, p. 883, n. 98. Statutes, 36 Cyc., p. 1106, n. 29; p. 1110, n. 56, 57; p. 1111, n. 59. Street Railroads, 36 Cyc., p. 1477, n. 9.

Appeal from St. Louis City Circuit Court.—*Hon. Franklin Miller*, Judge.

AFFIRMED.

*T. E. Francis* and *W. H. Woodward* for appellant.

Defendant was entitled to a directed verdict in its favor, because plaintiff's own testimony showed the unusual sudden stop of the car was made by the motorman in compliance with the ordinance pleaded and offered by defendant to avoid killing a lady pedestrian who ran directly in front of and in dangerous proximity to a moving street car. Hurck v. Railroad, 252 Mo. 39; Cleveland City Ry. Co. v. Osborn, 66 Ohio St. 45; Todd v. Mo. Pac. Ry. Co., 126 Mo. App. 684; Southern Ry. Co. v. Brooks, 125 Tenn. 260; Craig v. Boston El. Ry. Co., 207 Mass. 548; Dorr v. Lehigh Valley Railroad Co., 211 N. Y. 369; Stewart v. Railroad Co., 86 Vt. 398, 44 L. R. A. (N. S.) 433; State ex rel. Vogt v. Reynolds, 295 Mo. 375.

*Walter H. Brady* for respondent.

(1) Plaintiff's motion for a new trial was properly sustained. It was a question for the jury to determine when the first appearance of danger to the pedestrian accrued and whether the motorman exercised the degree of care exacted of him under the ordinance after the first appearance of danger to the pedestrian. Johnson v. Springfield Traction Co., 176 Mo. App. 189; Esstman v. U. Rys. Co., 216 S. W. 529; Criss v. U. Rys. Co., 183 Mo. App. 400; State ex rel. Vogt v. Reynolds, 295 Mo. 375. (2) The court properly sustained plaintiff's motion for a new trial, because the Vigilant-Watch Ordinance only requires such stopping of a street car as is consistent with the safety of the passengers thereon. Bunyan v. Citizens Ry. Co., 127 Mo. 18; Lyons v. Met. St. Ry. Co., 253 Mo. 158; Williams v. Met. St. Ry. Co., 114 Mo. App. 1; Ruschenberg v. So. Elec. Railroad Co., 161 Mo. 70; Burge v. Railroad Co., 244 Mo. 76. Plaintiff having made a prima-facie case, it was error to direct a verdict

for the defendant at the close of the whole case. God-
frey v. St. Paul Ins. Co., 232 S. W. 231; State ex rel.
Pabst Brew. Co. v. Ellison, 226 S. W. 577; Gannon v.
Laclede Gaslight Co., 145 Mo. 502.

.SEDDON, C.—Action to recover damages in the sum
of $15,000 for alleged personal injuries suffered by re-
spondent while a passenger upon appellant's street car
in St. Louis. The petition alleges: "Plaintiff, for her
cause of action against the defendant, states that on or
about the 2nd day of March, 1922, she boarded an east-
bound Park car of the defendant at the regular and usual
place for boarding said Park car on the west side of
Grand Avenue on said Park Avenue, for the purpose of
going east on said Park car, and plaintiff paid her fare
and complied with all the requirements of the defendant
and became a passenger on said car of defendant and
proceeded to walk through the aisle and toward the
front end of said car for the purpose of occupying a seat
near the front end of said car, and, while so walking
through said car, and while plaintiff was in the exercise
of due care, and while said car was proceeding in an east-
erly direction across said Grand Avenue at a point about
the middle of said Grand Avenue, the said car, by rea-
son of the carelessness and negligence of the defendant,
through his agents and servants, came to an instant,
abrupt, unusual, violent and sudden stop, whereby the
plaintiff was thrown with great force and violence from
a place in the aisle of said car to the front platform and
against the stove and the floor of the front platform of
said car, as a result of which she received and sustained
serious and permanent injuries."

The answer is a general denial, with the following
special defense:

"For further answer and defense defendant says
that the car on which plaintiff is alleged to have been a
passenger was checked and brought to a stop by reason
of the fact that a pedestrian walked in close and dan-

gerous proximity to said car and immediately in front of the same, and that the checking and stopping of the car was not negligence.

"For further answer and defense defendant says that Section 1054, paragraph 4, of the Revised Code of the City of St. Louis 1914, provides:

" 'The following rules, regulations and provisions concerning the running and management of street railway cars shall be binding upon every person, corporation or copartnership taking out license under the provisions of this article, or managing, controlling or operating street cars in the city of St. Louis. Fourth. The conductor, motorman, gripman, driver or any other person in charge of each car shall keep vigilant watch for all vehicles and persons on foot, especially children, either on the track or moving towards it, and on the first appearance of danger to such persons or vehicles the car shall be stopped in the shortest time and space possible.'

"And defendant avers that in checking and stopping the car the motorman was complying with the provisions of the above ordinance in that a woman suddenly approached and stepped upon the track immediately in front of and in close and dangerous proximity to the moving street car, and that the checking and stopping of the car in the manner in which it was checked and stopped was necessary to prevent striking and injuring the said pedestrian, and was in obedience to and in conformity with the above ordinance."

The reply is a general denial.

Plaintiff, a married woman fifty-three years of age, boarded defendant's Park Avenue street car at the usual stopping place at or near the southwest corner of Grand and Park avenues about 4:30 o'clock on the afternoon of March 2, 1922. Park Avenue is an east-and-west street, and Grand Avenue is a north-and-south street. The car which she boarded was eastbound on Park Avenue. Plaintiff paid her fare upon boarding the rear platform of the car and proceeded along the aisle of the car to-

ward the front platform for the purpose of taking a seat and, when she had reached about the second front seat of the car, the motorman in charge of the car made a sudden, violent, unusual and unexpected stop, thereby throwing plaintiff onto the front vestibule against a stove and poker and thence upon the floor of the front platform, resulting in certain alleged injuries of a rather serious nature. Plaintiff testified upon direct examination:

"While I was walking forward to take the front seat, so I could get off at Compton, they stopped the car very suddenly, to prevent hitting a woman who ran in front of the car.

"Q. How do you know they stopped to prevent hitting a woman? A. Well, the motorman said he did. . . .

"Q. The motorman's statement was to you that a woman had passed in front of the car? A. That a woman had passed in front of the car.

"Q. And he checked his car suddenly to avoid striking her? A. Yes; it threw me out."

Cross-examination: "Didn't you see this woman cross in front of the car? A. I did, and then—

"Q. You did see the woman? A. Yes, sir.

"Q. Now, this woman crossing in front of the car was coming from the north side of Park Avenue towards the south side? A. Yes, sir. . . .

"Q. Now, this woman crossing the street, was she running or walking? A. That I can't say, either.

"Q. She was moving quite rapidly, wasn't she? A. Yes, sir.

"Q. It was plain to be seen that she was hurrying across the street? A. Yes, she was hurrying. It was foolish for a person to do that.

"Q. In other words, she was so close to the car and her manner of hurrying was such that it attracted your attention? A. Yes. . . .

"Q. This woman who crossed in front of the street car, she was very close to the street car when she tried to hurry in front of it? A. Yes.

"Q. About how many feet? A. That's why he had to jerk up the cars so quick.

"Q. In feet? A. It would have killed her— . . .

"Q. How far would you say the car stopped from the moment the woman appeared until the car stopped? A. I can't tell you that.

"Q. In any event, it was a few feet; he stopped very suddenly? A. He certainly stopped very suddenly because I was firm on my feet before then, but I am not now.

"Q. Where was this woman when you first saw her, Mrs. Toomey? A. I can't tell; I can't say that.

"Q. About where was she when you first saw her? Was she on the north side of the street? A. She was crossing the track when I saw her. . . .

"Q. This woman appeared in front of the car quite suddenly from the side? A. I couldn't say that, either.

"Q. Was she on the east-bound track when you first saw her, or was she over in the west-bound track when you first saw her? A. Oh, I see what you mean now, she was just—when the car—I looked up to see why he—when the jerk came I wondered what happened and that is when I saw her, just at the jerk, and then I didn't see any more. I couldn't give you any full, definite description at all.

"The Court: The question is, where was she when you say you looked up and saw her when the jerk came? A. In the track.

"The Court: Q. Which one? A. Our car track, the car going east.

"The Court: Q. In the track that your car was on? A. In the track my car was on."

In substance, the fair import from plaintiff's testimony was that, when the sudden stopping of the car occurred, she then saw a pedestrian in the track on which the car was traveling and at a short distance in front of

the car. Exactly where the pedestrian came from, or how soon she could have been seen by the motorman prior to that time, plaintiff does not attempt, or was not able, to state. Plaintiff testified that the car was stopped with its front end in or about the center of Grand Avenue. She could not say whether the pedestrian was upon the cross-walk or not; "I don't know if she crossed in the crossing or street; I can't tell you." The casualty occurred during daylight. It had snowed the day before, but the snow had been cleared away and there was no moisture upon the street at the time.

Defendant offered the testimony of a woman passenger, who boarded the car at the same time as plaintiff, immediately behind the plaintiff. When witness was walking forward in the aisle to take a seat and had reached the fourth or fifth seat from the front of the car, the car stopped very suddenly. Witness saw plaintiff fall or "sit down" on the front platform. Witness also saw a pedestrian "come right in front of the car;" about five feet in front of the car between the rails of the track. The pedestrian was coming from the south and going north on the east side of Grand Avenue upon the cross-walk; she was crossing from the south to the north side, and had proceeded to a point about midway between the two rails of the track upon which the car was running. The car stopped instantly "to save the life of the person." There was nothing to obstruct the motorman's view of the pedestrian from the time she left the south curb line of Park Avenue until she got on the track; there was nothing between the motorman and the pedestrian to keep him from seeing her. Witness heard the motorman "gonging his bell all the way across the street." The car was traveling slowly at the time. The pedestrian was not struck by the car.

Defendant's motorman testified that he had been employed as a motorman for about twenty years. When his car crossed Grand Avenue, there was a car on the west-bound track unloading passengers at or about the

usual stopping point on the northeast corner of Park and Grand avenues, and "just about when I passed that car very slowly there was a lady coming from the corner of that car ran right directly in front of my car. . . . The west-bound car was facing west, and she got off on the north side of the street and run around. She came running right around behind her own car and ran right in front of my car. So, of course, there was nothing else left for me but make a very sudden stop, and anybody knows what a sudden stop is." When she came from behind the west-bound car, witness judged she was between seven and eight or ten feet from his car. He applied the brakes and checked the car down right away, because "I knew if I didn't I would hit her with the fender. . . . I applied my brake immediately and stopped to avoid hitting this lady. I used the air pretty strong. I just missed (her); just about six inches with the right-hand corner of the fender." Witness judged the car was traveling about four miles an hour and traveling at that speed with the appliances at hand "it takes all the way from ten to fifteen feet to make a nice smooth stop down-grade." The car was traveling down-grade at the time.

Defendant put in evidence the Vigilant-Watch Ordinance of St. Louis in force and effect at the time, the exact provisions of which ordinance are pleaded and set out in haec verba in the answer.

Upon the conclusion of all the evidence, defendant offered a peremptory instruction in the nature of a demurrer to the evidence, which the court nisi gave. Pursuant thereto, the jury returned a verdict for defendant, upon which judgment was entered. In due time, plaintiff filed a motion for a new trial, which motion was sustained by the trial court on the ground that the court erred in instructing the jury to render a verdict in favor of defendant and against the plaintiff. Defendant thereupon appealed to this court from the order granting a new trial.

I. Appellant assigns error of the court *nisi* in granting plaintiff a new trial on the ground specified in the trial court's order, because (it is contended) defendant, under all the facts and circumstances in evidence, was entitled to a directed verdict in his favor. It is urged that plaintiff's own testimony shows that the unusual and sudden stop of the car was made by defendant's motorman in compliance with the Vigilant-Watch Ordinance of St. Louis (pleaded and put in evidence by defendant), as said ordinance has been construed and applied by this court, in Banc, in State ex rel. Vogt v. Reynolds, 295 Mo. 375, 244 S. W. 929, in order to avoid killing a woman pedestrian who ran directly in front of and in dangerous proximity to the moving street car on which plaintiff was a passenger. It is conceded by appellant, in his brief and argument, that the evidence of both plaintiff and defendant shows that the street car on which plaintiff was a passenger, and which she had just boarded, was brought to an unusual and sudden stop, which by its very nature raises the presumption of negligence on the part of defendant. It is strenuously urged by appellant, however, that, inasmuch as the record clearly shows that the sudden and unusual stop of the street car was made in response to the high degree of care imposed upon him by the Vigilant-Watch Ordinance (in view of our application of that ordinance in the Vogt case, supra), and to avoid killing or seriously injuring the pedestrian, appellant has therefore absolved himself of actionable negligence, and it then devolved upon plaintiff to prove specific negligence. In support of his contention, appellant leans upon Hurck v. Railway Co., 252 Mo. l. c. 48, wherein we said: "The above-stated exception to the general rule (of presumption) is, it will be seen, wholesome doctrine, for if either by plaintiff's own evidence or by the evidence offered by defendant it appears that the usual happening (which by its very nature raises the presumption of negligence) was caused

*Due Regard For Passenger's Safety: Vigilant-Watch Ordinance.*

310 Mo. Sup.—45.

solely by *vis major,* or by any other instrumentality disconnected from any negligence of defendant, the presumption is undermined and falls and no case is made, and in that situation the plaintiff must fail unless he goes forward with evidence showing specific negligence.''

Appellant contends that the Vigilant-Watch Ordinance, by its express terms, requires the motorman, on the first appearance of danger to persons on foot or vehicles, to stop the car in the shortest time and space possible; that this court, in the Vogt case, supra, has ruled that ''the Vigilant-Watch Ordinance requires the motorman to be prepared to stop his car at the first appearance of danger, within the shortest time and space possible. It requires the motorman to anticipate that those approaching the track will come within the danger zone and that those within it will not seasonably leave it. . . . The foregoing considerations persuade us that the Vigilant-Watch Ordinance requires more than common-law care requires.'' Hence, it is argued that, since the Vigilant-Watch Ordinance, as heretofore construed and applied by us, exacts of appellant a higher degree of diligence and care than the common-law rule of ordinary care, the appellant, in observing the same and in endeavoring to save the life of, or serious injury to, a pedestrian by so doing, should not be accountable for, or held guilty of, actionable negligence.

Respondent, on the other hand, maintains that the Vigilant-Watch Ordinance, as construed and applied by this court, only requires of defendant such stopping of the street car as is consistent with the due safety of the passengers thereon. Appellant replies with the assertion that ''there is nothing in the Vigilant-Watch Ordinance about stopping the car with safety to passengers on the car,'' and maintains that, for this or any court to read into the ordinance the words, ''with safety to passengers on the car,'' would be legislating, which the judiciary is without power to do. The latter premise may be conceded without argument upon our part, for,

of course, it is for the legislative branch of the government to enact laws and not for the judicial branch. However it is the duty of the judiciary to construe and interprete the laws as enacted by the legislative branch of the government, and in so doing, certain rules of construction and interpretation have been laid down for our guidance and aid. Judge LAMM, in Decker v. Diemer, 299 Mo. l. c. 324, refers to one of these rules of construction in this concise language: ''At the outset of the discussion it will do to say, that in the practical administration of the law, a cardinal canon of construction, steadily applied, is to get at the intendment of the lawmaker and enforce that intendment. To that end it is trite doctrine that we should consider the former state of the law, the new provision, the evil sought to be removed, as well as the remedy provided, and so construe the law as to further the remedy and retard the evil. Such is a venerable rule of construction, none the less alive because old.''

Judge GRAY, in Joplin Supply Co. v. West, 149 Mo. App. l. c. 94, states the rule thuswise: ''There is another well-known rule to be followed in the construction of statutes, to-wit: Statutes must be construed in reference to the subject matter, the objects which prompted and induced their enactment and the mischief they were intended to remedy. [Neenan v. Smith, 50 Mo. 525; Spitler v. Young, 63 Mo. 42.] Also the intent of the Legislature, as contained in the statute, is the spirit of the law, and the construction of statutes is but a judicial reading of the intent of the law-making authority. [State ex rel. v. Hostetter, 137 Mo. 636; State ex rel. v. Slover, 126 Mo. 652.]''

It was evidently the intent of the legislative or law-making body of St. Louis, in the enactment of the Vigilant-Watch Ordinance, to impose upon licensed carriers controlling or operating street cars in that city a degree of care for the safety of persons on foot and vehicles within or approaching the danger zone of street-car tracks

higher than that imposed by the common law. Such, in effect, is the force and substance of our ruling in the Vogt case. There has, however, long been recognized and applied in this State, and in most other jurisdictions as well, a rule or doctrine, commonly called the humanitarian, or last-chance, doctrine. That rule or doctrine is applicable to the common-law rule of ordinary care. Said the St. Louis Court of Appeals in Dey v. Railways Co., 140 Mo. App. 1. c. 467: "The doctrine proceeds upon the precepts of humanity and of natural justice to the end that every person shall exercise ordinary care for the preservation of another after seeing him in peril or about to become imperilled, when such injury may be averted *without injury to others.*"

Like the last-chance, or humanitarian, doctrine, so the Vigilant-Watch Ordinance also proceeds upon the precepts of humanity and natural justice. The evident purpose and intent of the law-making body in enacting the ordinance, and the object which prompted and induced its enactment, was to better safeguard and protect persons on foot, especially children, and vehicles when approaching or upon the car tracks from injury and death. But it by no means follows that, in enacting this ordinance, the lawmakers intended to lessen one whit or abrogate the safeguards thrown by the law around the passenger, who entrusts his safety to the carrier, which, by accepting the passenger's fare as compensation therefor, impliedly agrees with him to exercise the highest practicable degree of care for his safety while he is a passenger upon its car. And this is true for the self-same reason that the protection which the common law throws around the passenger for his safety likewise may be said to proceed upon the precepts of humanity and natural justice. We think, therefore, that in construing and interpreting the true meaning and effect of the Vigilant-Watch Ordinance, we are in no sense invading the field or exclusive powers of the legislative branch of the government when we hold, as we do, that

it was not the intent of the lawmakers, in enacting the ordinance, to lessen in any degree or abrogate the safeguards thrown around the passenger by the common law.

In Gubernick v. Railways Co., 217 S. W. 33, while we held the Vigilant-Watch Ordinance is not the last chance rule, yet we recognized the fact that "the Vigilant-Watch Ordinance in a way covers some ground involved in our 'last chance rule' or 'humanitarian doctrine.' "

We have repeatedly held, in cases involving the application of the last-chance, or humanitarian, doctrine, that due regard for the safety of the passengers is an element that must be considered in all such cases. In Burge v. Railroad Co., 244 Mo. l. c. 98, 101, GRAVES, J., speaking for this court, in Banc, said: "In stopping a passenger train for any purpose, due regard must be had for the safety of the passengers. This element, a very material one, is left out of the question. . . . Due regard for the safety of the passengers is an element that must be considered in all such cases. We emphasize this because upon the cross-examination of the witness Taggert, the means, which he says he would use in bringing such a train to a stop, leaves out of consideration this material element."

Again, in Heinzle v. Railway Co., 182 Mo. l. c. 555, in ruling a hypothetical question propounded to an expert witness, we said: "It should have embraced the time and space within which a car like this one could have been stopped by a reasonably skillful motorman, after he discovered or might have by reasonable care discovered the little girl in danger, *with due regard to the safety of the passengers.*" (Italics are ours.) Similar in effect is Ruschenberg v. Railroad Co., 161 Mo. l. c. 81, 82.

In Bunyan v. Railway Co., 127 Mo. l. c. 18, we said: "It was the duty of the gripman, and other employees, to keep a *vigilant watch* for persons on or approaching the track, and, when discovered in danger, to use every possible effort, *consistent with the safety of passengers,* to avoid striking them."

In Lyons v. Railway Co., 253 Mo. l. c. 158, an instruction submitting the humanitarian theory was challenged because it told the jury that it was the duty of the motorman, after discovering a vehicle in danger, "to use all reasonable effort consistent with the safety of persons on board to avoid colliding with them," and we held the instruction rightly declared the law.

And in State ex rel. Vogt v. Reynolds, 295 Mo. 375, 244 S. W. 929, so strongly relied upon by appellant, in construing the Vigilant-Watch Ordinance now in question, we approved the language of an instruction which included the clause, "with due regard for the safety of the said car and the passengers thereon." This appears from the language of our opinion, in Banc: "Relator's Instruction 1 places upon defendant the duty to stop the car within the shortest time and space possible under the circumstances, *with due regard for the safety of the car and the passengers thereon,* and does not define the degree of care to be exercised by the motorman in so doing."

Whether the carrier has exercised due regard for the safety of the passengers, in suddenly and unexpectedly stopping the car, depends largely upon the facts and circumstances in each individual case and, we think, is ordinarily a question of fact for the determination of the jury. Necessarily so, because, if the rule were otherwise, then the election of the carrier to regard as foremost the safety of the pedestrian or vehicle on or approaching the track rather than the safety of the passengers upon the car would be conclusive in each and every case. There may be cases, similar to Southern Railway Co. v. Brooks, 125 Tenn. 260; Craig v. Railway Co., 207 Mass. 548; Dorr v. Railroad Co., 211 N. Y. 369; Cleveland City Railway Co. v. Osborn, 66 Ohio St. 45; and Stewart v. Railway Co., 86 Vt. 398, cited by appellant, which, perhaps, should not be submitted to the jury for determination because of their peculiar facts and an apparent, clear-cut and unquestionable conflict of the respective duties

to passengers and persons upon or near the track. Most of such cases, however, are those in which the minds or opinions of men could not reasonably differ upon the non-negligence of the carrier.

In some of these cited cases, it was shown in evidence that the carrier's agent in charge of the car or train did not know of the passenger's position and his liability to injury and the ruling is bottomed, to some extent, on that fact. In nearly all of them, it is conceded that the duty of railroad companies to safely carry and deliver their passengers is paramount to all other duties and must be strictly discharged; but it is held, with a certain apparent measure of reluctance, however, that, especially when the life of a pedestrian is imminently and almost certainly involved, less than imminent danger of bodily injury or death to those on the train will not excuse the observance of due precautions to save the life of the pedestrian. As said in Southern Railway Co. v. Brooks, supra: "Each case where conflict (of duties) presents itself must be determined upon its own particular facts." In the instant case, however, the motorman must have, or should have, known that plaintiff and at least one other woman passenger had just boarded the car and had not had time to become seated, for the car, according to all the evidence, had proceeded but a few feet at most after stopping to take on passengers before being suddenly and violently stopped again. If the stop was as violent and sudden as the motorman's own testimony indicates, then he should have known or anticipated that a passenger walking in the aisle would likely be thrown or caused to fall and be injured thereby. We believe, under the facts and circumstances here, that it was for the jury to say whether or not defendant was negligent in the premises. However, there is another and different reason, we think, why this case should have been submitted to the jury, which we next discuss.

II. Respondent asserts that it was a question of fact for the jury to determine when the first appearance

of danger to the pedestrian occurred and whether the
motorman exercised the degree of care exacted of him
                     under the Vigilant-Watch Ordinance upon the
Failure          first appearance of danger to the pedestrian.
to See
Pedestrian.      In other words, it is claimed that the motor-
                     man should have observed the danger, if any,
to the pedestrian before she had actually stepped into the
track upon which the car was running, in which event the
car might have been stopped less abruptly, but never-
theless with safety to the passengers thereon and the
pedestrian as well.

A critical study of plaintiff's testimony indicates to
our minds that she did not see the pedestrian until the
sudden stop occurred and she was falling upon the plat-
form. Hence, her testimony is of little or no weight
upon the point we now discuss. At the only time she
observed the pedestrian, the pedestrian was actually up-
on or within the car track. True, plaintiff stated upon
cross-examination that the pedestrian was coming from
the north side towards the south side of Park Avenue;
that "she was hurrying and it was foolish for a person
to do that. That's why he had to jerk up the car so
quick. It would have killed her." However, she quali-
fied her statement by saying: "She was just—when the
car—I looked up to see why he—*when the jerk came* I
wondered what happened and *that is when I saw her,
just at the jerk,* and then I didn't see any more. I
couldn't give you any full, definite description at all. I
was just walking up the aisle of the car. I saw some-
body, you know how you will see people passing. I
didn't pay any especial attention to her until the car
came—I didn't see her then until he started to (pull up
the car)." The statement of plaintiff that "it would
have killed her" was a pure conclusion upon plaintiff's
part.

Appellant's motorman, it is true, testified that the
pedestrian got off the west-bound car on the north side
of Park Avenue and "came running right around and

ran right in front of my car. I applied my brake immediately and stopped to avoid hitting this lady." The motorman, in a sense, however, was an interested party and, being such, the jury might or might not have believed his testimony. This is particularly true, inasmuch as the testimony of the other woman passenger, appellant's own witness, is wholly at variance with, and contradictory of, the testimony of the motorman. She testified quite positively, upon appellant's direct examination, that the pedestrian was coming from the *south* side of Park Avenue going *north* upon the cross-walk on the east side of Grand Avenue. According to appellant's own witness, vouched for by appellant when placed upon the witness stand, the pedestrian was traveling on the cross-walk in exactly the *opposite* direction from that testified to by the motorman. Furthermore, this witness testified that there was nothing to obstruct the motorman's view of the pedestrian from the time she left the south curb line of Park Avenue until she got in the track; there was nothing between the motorman and her to keep him from seeing her. If this witness's testimony is true, and the jury had the right to accept it as true, coming as it did from the mouth of defendant's own witness, then we think it was an issue of fact which should have been left to the jury for determination, whether, if the motorman had been keeping a vigilant watch, he should have seen her when the first appearance of danger occurred at the time she left the south curb line of Park Avenue and could or might then have brought his car to such a stop as would have avoided injury to both the pedestrian and the plaintiff passenger, instead of stopping, or starting to stop, the car when, and only until, she was actually within or upon the track.

In Johnson v. Traction Co., 176 Mo. App. 1. c. 189, the Springfield Court of Appeals, in speaking of the Vigilant-Watch Doctrine, said: "It is a question for the jury to determine *when* the first appearance of danger accrues under the facts of any particular case. When

there is an unobstructed view of a wagon, either on the track or so near thereto as to be in the danger zone, so that the jury is warranted in finding that the motorman either saw or by due care could have seen such wagon in the place of danger in abundant time to control or stop his car before colliding with it, then the time and place where his duty in this regard arose is necessarily somewhere between the place of first vision and the collision.''

In Criss v. Railways Co., 183 Mo. App. l. c. 400, 401, the St. Louis Court of Appeals said: ''There was substantial evidence here, first, that the motorman in this instance had not observed the Vigilant-Watch Ordinance. According to his own testimony he did not see this team until the horses had crossed the west rail of the northbound track. But the team had then traveled toward that track for about twenty-one feet from the building line and while going over that distance was in plain sight. . . . The jury had a right to infer from this that the motorman was not keeping a vigilant watch for wayfarers or teams on the track ahead of his on-coming car.''

In Esstman v. Railways Co., 216 S. W. l. c. 528, 529, this division of this court ruled that whether the street car was stopped upon the first appearance of danger to a child crossing the street was a question for the jury to decide.

We perceive no error in the action of the trial court in granting a new trial upon the ground that it erred in instructing the jury to render a verdict in favor of the defendant and against the plaintiff. The order of the court *nisi* in granting a new trial of the action is accordingly affirmed and the cause is remanded for that purpose. *Lindsay, C.,* concurs.

PER CURIAM:—The foregoing opinion by SEDDON, C., is adopted as the opinion of the court. All of the judges concur, except *Woodson, J.,* absent.