**UNION TRUST CO. OF DISTRICT OF COLUMBIA et al. v. UNITED STATES**
**(two cases).**

**Civ. Nos. 4691–50, 4692–50.**

United States District Court
for the District of Columbia.

May 5, 1953.

Galiher & Stewart, Washington, D. C., and Bigham, Englar, Jones & Houston, New York City, for defendant Eastern Air Lines, Inc.

David G. Bress and Sheldon Bernstein, Washington, D. C., for Union Trust Co.

Ross O'Donoghue and Vincent Burke, Jr., Asst. U. S. Attys., Washington, D. C., for U. S.

McGUIRE, District Judge.

These are wrongful death actions by the executor of the estates of Ralph E. Miller and Mildred Miller, husband and wife, who died in an air collision of November 1, 1949, in the vicinity of Washington National Airport while they were passengers in an Eastern Airlines plane.

Before trial the parties had stipulated and agreed on the following facts:

At approximately 11:46–11:47 A.M., E.S.T., on November 1, 1949, an Eastern Airlines DC-4 No. N88727, denominated as Eastern flight 537, and a P-38 military type aircraft No. NX-26927 collided in mid-air while the Eastern DC-4 plane was approximately 300 feet in the air on final approach for landing on runway number 3 at the Washington National Airport, Washington, D. C. Eastern flight 537 was carrying a crew of 4 persons (pilot, copilot, steward and stewardess) and 51 passengers, all of whom, including plaintiffs' decedents, were killed in and as a direct and proximate result of said accident. The P-38 was carrying only the pilot, Eric Rios Bridoux, a citizen of Bolivia and an officer in the Bolivian Air Force who was then operating the P-38. Bridoux was seriously injured in said collision but survived. Both aircraft were completely wrecked and such debris or components of the planes as were thereafter found in or near the scene of the collision are indicated on a stipulated chart.

Eastern's flight 537 was enroute from Boston, Massachusetts, via intermediate points to Washington, D. C. Over Beltsville, Maryland, 15 miles northeast of the Washington National Airport, flight 537 contacted the Washington control tower on 119.1 megacycles voice radio communica-

tions and the flight was cleared by the tower to enter a left traffic pattern for landing on runway number 3. One minute before that clearance, that is, at 11:37 A.M., E.S.T., the P-38 had taken off from runway number 3 at Washington National Airport on a test flight. From the time the P-38 departed until after the accident, visibility in the vicinity of the airport remained at 15 miles, ceiling was 6,500 feet with scattered clouds at 3,500 and surface wind was from the northeast 20–25 miles per hour.

As to the defendant Eastern Airlines, there was a jury verdict against it, while the defendant Bridoux was exonerated.

The case of the defendant United States was tried to the Court at the same time, the plaintiff alleging negligence of a concurring character specifically set forth in a pretrial stipulation:

a. The failure of the control tower personnel to issue a timely warning to the Eastern plane as to the P-38 being on final approach;

b. The failure of the tower personnel to take appropriate steps to warn the P-38 that the Eastern plane was on final approach and to deter him from flight actions inconsistent with or dangerous thereto;

c. The failure of the tower personnel to take appropriate action to separate the two planes involved so as to avoid collision;

d. The failure of the tower personnel to employ simultaneous radio transmissions to both planes to assure each being advised as to the actions of and the directions to the other;

e. The failure of the tower personnel to require the Eastern plane to follow the prescribed landing pattern and toleration of a shortcut thereof;

f. The failure of the tower to warn the P-38 that the Eastern plane was not following the prescribed landing pattern but was shortcutting same;

g. Violation of air regulations then and there in full force and effect, as follows: Civil Air Regulations, Part 26, § 26.26, Aeronautical Rules for the Washington National Airport, § 571.3.

■ I conclude under the statute, the Federal Tort Claims Act, 28 U.S.C.A. §§

1346, 2671 et seq., so-called, relied upon by the plaintiff in its suit against the Government, that the United States has waived immunity, and the Court has jurisdiction.

The case of Feres, Executrix v. United States, 340 U.S. 135, 71 S.Ct. 153, 95 L.Ed. 152, relied on heavily by the Government in support of its motion for a directed judgment in its favor, can be distinguished.

True, Mr. Justice Jackson, who spoke for the Court and interpreting the statute said: " * * * It will be seen that this is not the creation of new causes of action but acceptance of liability under circumstances that would bring *private* [emphasis supplied] liability into existence." 340 U.S. at page 141, 71 S.Ct. at page 157.

And it is on this language that the Government seizes with avidity. It contends that since the United States, through the Civil Aeronautics Board and the Administrator of Civil Aeronautics, in discharge of a congressional mandate, has promulgated exhaustive and complete air traffic rules governing all phases of air traffic operation and control, which have nationwide force and application—that this is a function sovereign in character and constitutional in genesis:

"Congress has recognized the natural responsibility for regulating air commerce. Federal control is intensive and exclusive. Planes do not wander about in the sky like vagrant clouds. They move only by federal permission, subject to federal inspection, in the hands of federally certified personnel and under an intricate system of federal commands. The moment a ship taxis onto a runway it is caught up in an elaborate and detailed system of controls. *It takes off only by instruction from the control tower, it travels on prescribed beams, it may be diverted from its intended landing, and it obeys signals and orders.* [Emphasis supplied] Its privileges, rights, and protection, so far as transit is concerned, it owes to the Federal Government alone and not to any state government." Northwest Air Lines v. State of Minnesota, 1944, 322 U.S. 292, 303, 64 S.Ct. 950, 956, 88 L.Ed. 1283.

With the duty thus imposed of the "regulation of air commerce in such manner as to best promote its development and safety * * *", Title 49 U.S.C.A. § 402(e), there follows as a matter of course the corollary responsibility to promote safety of flight, by the prescription of air traffic rules, and their revision from time to time as circumstances and conditions warrant and dictate, " * * * for the prevention of collisions between aircraft, and between aircraft and land or water vehicles." 49 U.S.C.A. § 551(a) (7).

Thus the Government concludes since this function is purely governmental—that is, sovereign—there is no liability since the only allowable claims are those which " * * * in the same manner and to the same extent a private individual under like circumstances * * *" would be liable for, with certain exceptions not material here, and since there is no liability of a private individual "even remotely analogous to that * * *" now asserted against the United States, the claim falls.

For it is argued no private individual has power to assume the prerogatives of sovereignty, for no private person, individual or corporate could possibly act in the capacity in which the United States acts in its regulation of air commerce, citing Feres, supra.

But the Feres case as has been said can be distinguished for it went off on the matter of status. And the distinction is one of substance. Feres was a soldier who perished in a barracks fire while on active duty; the negligence alleged being the quartering him in barracks which were known or should have been known to have been unsafe because of a defective heating plant—the Court concluding:

"We know of no American law which ever has permitted a *soldier to recover for negligence, against either his superior officers or the Government he is serving.* [Italics supplied.] Nor is there any liability 'under like circumstances,' for no private individual has power to conscript or mobilize a private army with such authorities over persons as the Government vests in echelons of com-

mand." 340 U.S. supra, at page 141, 71 S.Ct. at page 157.

It is upon this language which the Government strongly relies, but in support of the distinction made, it is suggested that the concluding paragraph of the opinion, 340 U.S. supra, at page 146, 71 S.Ct. 153, clearly and conclusively shows that the Government's argument is actually what it purports to be—analogous only, and remotely so. That paragraph as is germane reads as follows:

"We conclude that the Government is not liable under the Federal Tort Claims Act for injuries to servicemen where the injuries arise out of or are in the course of activity incident to service. * * * We do not think that Congress, in drafting this Act, created a new cause of action dependent on local law for *service-connected* injuries or death due to negligence." (Emphasis supplied.) 340 U.S. supra, at page 146, 71 S.Ct. at page 159.

Thus it appears emphasizing the distinction made.

In this connection it is interesting to note the case of United States v. Spelar, 338 U.S. 217, 70 S.Ct. 10, 94 L.Ed. 3, decided in October Term 1949 and just about eleven months before the decision in Feres. There, the District Court of the United States for the Eastern District of New York dismissed an action brought against the United States under the Act to recover for the wrongful death of a flight engineer at an airfield in Newfoundland leased by the United States from Great Britain, alleging, it appears, negligence upon the part of the United States in the operation of the field. Spelar v. U. S., D.C., 75 F.Supp. 967. The Court of Appeals, 2 Cir., reversed, 171 F.2d 208.

The decedent Spelar was an employee of American Overseas Airlines and was killed in a take-off crash. The plane involved was that of the decedent. The District Court as has been said dismissed the action,—not, however, on the ground of governmental immunity but predicated its action on the fact of the incident occurring in a "foreign country" and thus within a specific exception set forth in the statute.[1] The Supreme Court reversed the Court of Appeals, holding with the Court of first instance.

Now this is of interest solely as an indication that apparently the government in the Spelar case was not quite so certain of the point it argues here with such urgency, and it must have had some doubt about it, because it preferred to take its position on the more certain ground of a statutory exception. Nor was an appeal taken in Cerri v. United States, 80 F.Supp. 831 at page 833, in which Judge Roche met the issue head on and decided it adversely to the government, and in an opinion that has since been liberally quoted and relied on.

Certainly if the regulation of air commerce is a sovereign function that of the Coast Guard is sovereign also, being as it is "a military service and a branch of the armed forces of the United States at all times * * *", Title 14, U.S.C.A. § 1, and an essential part of its function is aids to navigation. 14 U.S.C.A. § 81.

And further, part of its function in this respect is to maintain Loran stations "(b) required to serve the needs of the maritime commerce of the United States; or (c) *required to serve the needs of the air commerce of the United States as determined by the Administrator of Civil Aeronautics.*" (Italics supplied.) Id.; cf. also 14 U.S.C.A. § 82.

Yet it has been held that a case was stated against the United States under the Federal Tort Claims Act, the negligence alleged being that of creating and marking the wreck of an old battleship. The Court, citing and adopting the distinction herein made of the reach and effect of the Feres case, supra.

Somerset Seafood Co. v. United States, 4 Cir., 1951, 193 F.2d 631, 633, 634, 635, citing Cerri v. U. S., supra, with approval.

█ The conclusions thus reached, it seems to me, are indicative of the fact that

1. 28 U.S.C. § 2680(k).

the technical niceties hitherto drawn between what are governmental and other functions are rapidly being done away with in an age in which the activities of the Government impinge so manifoldly upon the individual citizen in nearly all of his. The present climate of public opinion, of which the Federal Tort Claims Act is the most conspicuous example, is to the effect that the fiction of sovereign immunity is for the most part outmoded and as far as it relates to the act in question, preserved only in those specific exceptions which Congress has specifically indicated and of which the activity with which we are here concerned is not one. See generally, Federal Crop Ins. Co. v. Merrill, 1947, 332 U.S. 380, 383, 68 S.Ct. 1, 92 L.Ed. 10.

As the Supreme Court has further said, in United States v. Yellow Cab Co., 1950, 340 U.S. 543, at page 547, 548, 549 and 550, 71 S.Ct. 399, 402, 95 L.Ed. 523, in relation to the Federal Tort Claims Act:

"The Federal Tort Claims Act waives the Government's immunity from suit in sweeping language. It unquestionably waives it in favor of an injured person. * * *

"This Act does not subject the Government to a previously unrecognized type of obligation. Through hundreds of private relief acts, each Congress for many years has recognized the Government's obligation to pay claims on account of damage to or loss of property or on account of personal injury or death caused by negligent or wrongful acts of employees of the Government. This Act merely substitutes the District Courts for Congress as the agency to determine the validity and amount of the claims. It suggests no reason for reading into it fine distinctions between various types of such claims. * * *

" * * * The proceedings emphasized the benefits to be derived from relieving Congress of the pressure of private claims. Recognizing such a clearly defined breadth of purpose for the bill as a whole, and the general trend toward increasing the scope of the waiver by the United States of its sovereign immunity from suit, it is inconsistent to whittle it down by refinements."

New York State has had a similar statute for some years. See: Jackson v. State of New York, 1933, 261 N.Y. 134, 184 N.E. 735; Bloom v. Jewish Board of Guardians, 1941, 286 N.Y. 349, 36 N.E.2d 617; Foley v. State of New York, 1945, 294 N.Y. 275, 62 N.E.2d 69, citing Jackson v. State of New York and Bloom v. Jewish Board of Guardians, supra. Moch Co. v. Rensselaer Water Co., 247 N.Y. 160, 159 N.E. 896, 62 A.L.R. 1199 can be distinguished.

■ All of which leads to this: When the Government, as here, takes upon itself the function—as it claims it must—of the regulation of air commerce and the responsibility, among other things, of regulating the flow of traffic at a public airport, the assumption of such a responsibility involves something further, namely, not only an activity designed to be protective of the interest of that amorphous group known as the public as a whole, but that of individuals as well, against potential hazards incident to such performance and implicit in its undertaking. And if injury or death results as a consequence of the negligence of its servants or agents so engaged, Congress has decreed that the mantle of sovereignty which heretofore has protected it, falls from its shoulders and thus what was formerly at best an unenforceable moral obligation is thus transmuted into an actionable legal right. And whatever exceptions there are, this is not one of them.

Such I find to be the situation here and so hold.

■ So much for liability. As to negligence, I find that there was failure of the control tower personnel to issue a timely warning to the Eastern plane as to the P-38 being on final approach; in the failure, also, to warn the P-38 that Eastern was on final approach; in clearing both planes for the same runway at approximately the same time, having in mind their respective positions in relation to each other and the speed of both their approach and descent; and the failure to keep both planes advised as to the activities of the

other; I find this to be negligence and concurrent both in character and in relation to that found by the jury with respect to the defendant Eastern. I find, further, that such negligence contributed proximately to the injury complained of.

With respect to the locale, the Court concurs in the finding of the jury that the accident occurred in the District of Columbia. This particular question was not easy of resolution. The presentation of evidence with respect to it took many trial days and it was a very long trial. But a careful evaluation of it, having in mind such pertinent and persuasive factors as the narrowness, so to speak, of the geographical area involved in relation to the line of demarcation between the District of Columbia and the Commonwealth of Virginia; the allowing for the widening angle of vision from the position of an observer on the ground in relation to an object in the air unless directly overhead; and the grave possibility of error resulting therefrom; the very suddenness of the business, so to speak; the nature and character of the terrain, etc., all lead to this conclusion. In addition, by way of corollary and in support of this finding, the testimony of an expert, skilled in the science of aerodynamics and predicated basically on admitted facts as to where the major wreckage of the carrier was found, and his mathematical reconstruction as a consequence of the episode, allowing as he did for such factors as speed, wind velocity, weight, altitude, position, direction; the type of aircraft involved; the character of the collision, and result to the passenger plane and *where,* in relation to its fusilage; the aerodynamic characteristics involved from the time its tail fell off; the horizontal advance of the forward section; the character and nature of falling bodies generally and those specifically involved here; conclusively resolves the question as far as the Court is concerned, indicating as it did in relation to all of the evidence that it preponderated decisively in favor of the factual resolution reached.

With reference to damages, I also concur in the verdict of the jury and find accordingly, i. e., $50,000 for the estate of the male decedent and $15,000 for that of the female. Nor do I in the present state of the economic worth of the dollar and the evidence adduced herein conclude in either case such sums to be in any way excessive. Counsel will prepare tentative findings of fact and judgment. Order accordingly.