370 F.Supp. 992 (1973)
Frances Ann ALLEN, Individually and as next friend of Jess Cole Allen et al.
v.
UNITED STATES of America, Third Party Plaintiff and Defendant,
v.
OZARK AIRLINES, INC., Third Party Defendant.
Rosemary WILLIAMS, Individually, et al.
v.
UNITED STATES of America, Defendant and Third Party Plaintiff,
v.
OZARK AIRLINES, INC.
Nos. 70 C 440(3), 70 C 629(3).
United States District Court, E. D. Missouri, E. D.
December 12, 1973.
*993 *994 *995 Gray & Friedman, St. Louis, Mo., for plaintiffs in No. 70C440(3).
Aubuchon & Walsh, St. Louis, Mo., for plaintiffs in No. 70C629(3).
Daniel Bartlett, Jr., U. S. Atty., Moser, Marsalek, Carpenter, Cleary, Jaeckel, Keaney & Brown, St. Louis, Mo., for Ozark Airlines.

MEMORANDUM
WANGELIN, District Judge.
These actions are before the Court for a decision on the merits following the consolidated trial to the Court sitting without a jury on September 5, 6. 7, 8, 11 and 12, 1972.
Plaintiffs, the surviving spouses and minor children of Bobby Lee Allen and John Brooks, brought their wrongful death actions against the United States under the Federal Tort Claims Act, 28 U.S.C. §§ 1346(b) and 2671 et seq., alleging that the mid-air collision between a Cessna aircraft and a DC-9 aircraft was caused by the negligence of the air traffic controllers, agents of the United States, and seeking money damages in the amount of Fifty Thousand Dollars ($50,000.00) each.
The Allen action was commenced with the filing of suit on August 31, 1970 against the United States. Similarly, the Brooks action began against the United States on December 11, 1970. Subsequently, the United States filed a third party complaint in the Allen case on January 13, 1971, and in the Brooks case on March 2, 1971, for indemnification or in the alternative a right of contribution as against Ozark Air Lines, Inc. Thereafter, the Allen plaintiffs filed an amended complaint joining Ozark Air Lines, Inc., as a party defendant.
The Allen and Brooks cases were consolidated for purposes of trial. The Court being fully apprised of the premises hereby makes the following findings of fact and conclusions of law.

FINDINGS OF FACT
1. On March 27, 1968, at approximately 1757:12 CST (5:57 p. m.) (all times herein shall be CST) a mid-air collision occurred between an Ozark Air Lines DC-9, flight 965, and a Cessna 150 aircraft, registration mark N8669G, approximately one and one half (1½) miles north of the extension of Runway 17 at Lambert-St. Louis Municipal Airport. *996 Consequently, the Cessna crashed and the occupants therein, Bobby Lee Allen and John Brooks, were killed.
2. The collision occurred at an altitude of approximately 1100 feet, mean sea level, during daylight. The U. S. Weather Bureau at St. Louis reported the following meteorological information at the time of the accident: special high thin broken clouds, visibility 15 miles, temperature 69° F., dew point 45° F., wind 170° at 18 knots, gusts 24 knots, altimeter setting 30.06 inches.
3. At the time of the collision, Visual Flight Rules (VFR) were in effect and the active runway at Lambert Field was Runway 17.
4. Ozark Flight 965, N970Z was a regularly scheduled passenger flight which originated in Chicago, Illinois, and terminated at St. Louis, Missouri, with an en route stop at Peoria, Illinois.
5. Ozark Flight 965, was being piloted by Captain R. J. Fitch and First Officer W. C. Oltman. Captain Fitch held an airline transport rating with a type rating in the DC-9 and had accumulated 24,127 total flying hours. First Officer Oltman also held an airline transport rating, was type rated in the DC-9 and had approximately 9,805 flying hours. Captain R. W. Traub, a check pilot for Ozark Air Lines, was occupying the jumpseat, but was not conducting any official check on this flight.
6. Prior to and at the time of the collision, Ozark Flight 965 was being flown by the First Officer, W. C. Oltman, who was seated in the right hand seat of the cockpit.
7. Cessna 150 F, N8669G, was scheduled as an instructor-training flight for one and one half (1½) hours duration. Bobby Lee Allen was the instructor-pilot and John Brooks was instructor-trainee. Allen was a flight instructor, held a commercial pilot certificate with a single engine rating, and has approximately 384 flying hours. Brooks also held a commercial pilot certificate with a single engine rating and had approximately 174 flying hours.
8. Before, during and immediately after the accident, the defendant USA in connection with its prescribed air traffic activities was operating an air traffic control facility at Lambert-St. Louis Municipal Airport through air traffic controllers who were regularly in the service and employ of the Federal Aviation Agency (hereinafter called the FAA) of the defendant USA.
9. Lambert-St. Louis Municipal Airport is an FAA approved airport. Its field elevation is 571 feet M.S.L. (mean sea level). The airport's control tower provides approach and departure as well as local and ground control. Radar is employed by approach control to provide separation between aircraft flying on instruments from the limits of the radar coverage until the aircraft are cleared for an approach to the airport. With such clearance, the aircraft are then turned over to the local controller who directs the descent, direction and separation on final approach. Prior to and at the time of collision there were six FAA controllers in the tower cab.
10. St. Louis-Lambert Municipal Airport at time of the accident had no published VFR traffic pattern procedures.
11. Ozark 965 departed from Peoria at approximately 1731 with 44 passengers and a crew of five. The flight proceeded routinely to the St. Louis area in accordance with its Instrument Flight Rules (IFR) clearance and, at approximately 1749, radar control of the aircraft was transferred from Kansas City Air Route Traffic Control Center to St. Louis Approach Control. Ozark Flight 965 was advised that it was in radar contact and was cleared to descent from 6,000 feet to 2,600 feet on a heading of 190° with radar vectors to the outer marker, for an ILS approach to Runway 12 right.
12. Prior to reaching the outer marker, Ozark Flight 965 reported at 1754:55 that it had the airport in sight. St. Louis Approach Control then advised at 1754:59 "OK, YOU CAN START A LEFT TURN THEN AH FOR ONE SEVEN IF YOU LIKE, YOU'RE *997 CLEARED FOR A ONE TWO RIGHT ILS APPROACH OR A CONTACT APPROACH, CONTACT THE TOWER NOW ONE ONE EIGHT POINT FIVE." Ozark 965 responded at 1755:08 CST "OK, OH NOW RUNWAY'S ONE SEVEN YOU SAY?" Approach control confirmed with "YEAH, THE ACTIVE RUNWAY IS ONE SEVEN, THE WIND IS ONE SEVEN ZERO DEGREES ONE FIVE TO TWO ZERO." Ozark 965 acknowledged that transmission at 1755:20. Thereafter, Approach Control observed the aircraft's target on the radarscope beginning a left turn. Such turn was commenced about 1 mile north of the outer marker.
13. There is no information available concerning the conduct or the whereabouts of the Cessna 150 F, n18669G, until 1754:00 when it reported to St. Louis Tower, "SIX NINE GOLF ST. CHARLES WITH GOLF." But because of tower frequency congestion, the Cessna was told at 1754:04, "SIX NINER GOLF STAND BY I'LL GET TO YOU IN A MOMENT." At 1754:43, the Tower told the Cessna to "REPORT RIGHT DOWNWIND RUNWAY ONE SEVEN . . ." This transmission was not acknowledged by the Cessna. Thereafter, the Cessna headed in a general southeastwardly direction toward the extension of Runway One Seven.
14. At 1756:09, Ozark 965 reported to the St. Louis Local Control with, "OZARK NINE SIXTY FIVE ON A RIGHT BASE." At this point the tower controller visually observed Ozark 965 which was proceeding in an eastwardly direction and sought its identification at 1756:21 with, ". . . AND OZARK NINE SIXTY FIVE THAT YOU ON THE BASE." Ozark 965 replied affirmatively. At 1756:31, St. Louis Local Control gave Ozark 965 not a clearance to land but a sequence to land with, "OK, YOU'RE NUMBER TWO TO FOLLOW A CESSNA ON A REAL SHORT FINAL FOR ONE SEVEN AND TRAFFIC IS A CESSNA LOOKS LIKE AHEAD AND TO YOUR RIGHT MAYBE TO YOUR LEFT THERE NORTHEAST BOUND." From this time prospectively, both Ozark 965 and Cessna N8669G were visible to the controllers in the tower cab. Moreover, for approximately fifty seconds up until the collision, the crew chief observed Cessna N8669G through his binoculars.
15. Ozark 965 crew members heard this traffic advisory, however, they did not locate Cessna N8669G. Passengers aboard Ozark 965 had seen the Cessna for up to 1½ to 2 minutes prior to the collision. The pilot of Ozark 965, Captain Fitch, testified that crew members were able to see aircraft beneath the Ozark equally as well as passengers aboard the plane.
16. The next communication from the local controller to Cessna N8669G was at 1756:43, "SIX NINE GOLF IF THAT'S YOU OUT THERE ABOUT TO TURN FINAL PULL OUT TO YOUR AH WELL JUST PROCEED STRAIGHT ON ACROSS THE FINAL AND ENTER ON A LEFT BASE LEG FOR RUNWAY ONE SEVEN. YOU'LL BE FOLLOWING AN OZARK DC-9 TURNING FINAL ABOUT TWO OUT, MAYBE TO YOUR LEFT AND ABOVE YOU, YOU HAVE HIM?" At the time of this transmission Ozark 965 was at an approximate altitude of 1,600 feet (MSL) at a heading of 112°. Also, at this time the Cessna was at a constant approximate altitude of 800 to 1,000 feet. Cessna N8669G replied at 1756:58, "SIX NINE GOLF ROGER." At the time of this transmission Ozark 965 was at an approximate altitude of 1,350 feet (MSL).
17. The local controller testified that he thought Cessna N8669G was already clear of the extension of Runway 17 and that the Cessna did not deviate from the instructions to proceed straight ahead across the final. Ground witnesses further corroborated the fact that the Cessna maintained a constant southern heading and altitude until an instant before the collision.
18. Because of the high wing structure of Cessna N8669G, the occupants of *998 the Cessna could not observe Ozark 965 until seconds before the collision.
19. Prior to the collision, Ozark 965 was above, behind and to the left of Cessna N8669G.
20. At 1757:06, St. Louis Local Control gave the following traffic advisory to Ozark 965, "OZARK NINE SIX FIVE TRAFFIC'S THAT CESSNA OFF TO YOUR RIGHT LOOKS LIKE HE'S WA EASTBOUND." At the time of this transmission, six seconds before impact, Ozark 965 was at an altitude of 1,200 feet (MSL) and a heading of 157°.
21. Immediately prior to the collision the Ozark Captain saw the Cessna and attempted the evasive action of going into a sharp bank to the left by raising the right wing.
22. At 1757:12, Cessna N8669G collided with the lower surface of the right wing of Ozark 965, at an altitude of 1100 feet (MSL) which caused the Cessna to fall to the ground killing the occupants.
23. Following the collision, Ozark 965 continued its approach and landed on Runway 17 at approximately 1758.

CONCLUSIONS OF LAW

Liability of the United States
Both plaintiffs in their action against the United States through its employees and agents, traffic controllers, allege the following two basic acts of negligence, one of commission and one of omission: giving instructions to the Cessna to proceed on a collision course; and failure to give emergency warning. We shall consider these allegations respectively after briefly reviewing the pertinent evidence and law.
The transcript of the Local Control radio communications shows that at 1756:09 Ozark 965 reported to local control on its right base. In response, at 1756:21, the local controller confirmed visual observation of the Ozark preceding in a southeasterly direction, at a point northwest of the Cessna, placing the Ozark above and behind the Cessna. At this time, approximately fifty seconds prior to collision, both the Cessna and the Ozark were observed by the local controller, also from this time until the collision, the crew chief viewed the Cessna through binoculars.[1] Thereafter, at 1756:31, the local controller sequenced the Ozark to land following another Cessna on Runway One Seven and gave a traffic advisory indicating there was a Cessna ahead and to the right or left northeast bound. With this sequencing, the Ozark began its right bank so as to change course from its general southeastern direction to line up with Runway One Seven or a one hundred seventy degree heading. In the meantime, the local controller, believing the Cessna to be already clear of the extension of Runway One Seven and observing the Ozark turning right into final, above and behind the Cessna, instructed the Cessna at 1756:43 to "PROCEED STRAIGHT ON ACROSS THE FINAL" while advising of the Ozark traffic. Ground witnesses, passengers aboard the Ozark and the local controller, all testified they observed the Cessna continuing on a constant heading.[2] The Cessna responded at 1756:58 with "SIX NINE GOLF ROGER." *999 Six seconds prior to the collision, at 1757:06, the local controller issued a final traffic advisory to the Ozark informing him that there was a "CESSNA OFF TO YOUR RIGHT LOOKS LIKE HE'S WA EAST BOUND." Seconds before the collision the Ozark pilot saw the Cessna in time to raise the right wing before the impact at 1757:12.
Under the Federal Tort Claims Act, 28 U.S.C. §§ 1346, 2671 et seq., the United States has waived, with certain enumerated exceptions the Federal Government's immunity from liability in tort for the acts of its officers, employees and representatives. This Court has jurisdiction in accordance with 28 U.S.C. § 1346(b) giving District Courts jurisdiction for civil actions arising from the acts or omissions of any employee of the Federal Government while acting within the scope of his office or employment. Pursuant to the Act, the Government has consented to be sued and is liable for the negligence of the FAA air traffic control personnel. Johnson v. United States, 183 F.Supp. 489 (E.D.Mich.1960); Union Trust Co. v. United States, 113 F.Supp. 80 (D.C. 1953). Such Government employees are required to act in a reasonable manner. The failure to do so renders the Government liable for omissions or commissions. Indian Towing Co. v. United States, 350 U.S. 61, 76 S.Ct. 122, 100 L. Ed. 48 (1955). The reasonable manner standard rests partly upon "the requirements of procedures manuals spelling out the functions of its air traffic controllers or upon the pilot reliance on the Government for a given service. Gill v. United States, 429 F.2d 1072 (5th Cir. 1970); Hartz v. United States, 387 F.2d 870 (5th Cir. 1968).
One of these manuals as pointed out in plaintiff's brief is the Air Traffic Control Series Handbook GS-2152,[3] in effect at the time of the collision, which provides some of the general duties of air traffic controllers:
"The most important characteristic of all of these positions is a responsibility for life and property, engendered by their responsibility for assuring the safe, orderly, and expeditious movement of air traffic. Another inherent characteristic of all operating, working-level air traffic control positions is a requirement for coordination with other individuals in regard to transfer of information, planning of control actions to avoid conflict with another controller's planned actions, and requests to other positions or facilities for approval of proposed courses of action. Thus, the ability to communicate clearly, to take into account the plans of other individuals, to assess the effects of current or planned courses of action, and to adapt quickly to rapidly-changing situations is important in all of these positions."[4]
Other duties as provided in the handbook are:
"The functions of the terminal facility include: issuing control instructions by radio or visual signals to prevent collision between and provide for rapid movement of aircraft taking off, landing, approaching for a landing, or flying within the control area of the facility; . . ."[5]
Some of the general duties of the local controller as indicated in the handbook are:
"Local control duties are the duties involved in sequencing, spacing, and issuing clearances and instructions to aircraft operating in the tower's area of responsibility. In performing these duties, the controller considers: the position, type, speed, and direction of movement of aircraft desiring to land; his estimate of their future positions; the number and capabilities of aircraft wishing to depart from the airport; *1000 the pattern, length, direction, and condition of runways available for use; wind speed and direction; noise abatement requirements; wake turbulence; and traffic information."[6]
The evidence clearly shows that the government violated the aforesaid duties by placing Ozark 965 and Cessna N8669G on a collision course. The local controller sequenced the Ozark for landing on One Seven, therefore, making him as well as the other controllers cognizant of the approximate approach of the Ozark. Thereafter, he instructed the Cessna to continue straight on across that same approach path. In Cattaro v. Northwest Airlines, Inc., 236 F.Supp. 889 (E.D.Va.1964), a B-47 pilot requested and received permission from the Minneapolis Control Center to drop down to a 23,000-foot altitude and enter a holding pattern in the area the Control Center knew, or should have known, a Northwest flight was about to enter. The Government argued that the air traffic controllers had no duty or obligation to keep the B-47 bomber and the Northwest airliner apart. However, the Government was held liable as the Court stated in part:
[h]ad the controllers conferred with each other (they were working within six feet of each other) or familiarized themselves with the recorded flight plans of the two aircraft in question the collision hazard thus created would have been avoided. A Government air traffic controller cannot authorize an airplane to fly a collision course with another airplane then being monitored by another Government controller and escape liability by claiming neither controller had a duty to separate them.[7]
Similarly, here, not two but one Government air traffic controller authorized the aforementioned aircraft to fly a collision course and for this there can be no escape from liability.
In contravention, the Government asserts that the instruction issued by the local controller to proceed straight across final was merely advisory. However, the mandatory nature of such instructions is clearly provided for in the federal regulation, which states:
"Compliance with ATC clearance and instructions.
(a) When an ATC clearance has been obtained, no pilot in command may deviate from that clearance, except in an emergency, unless he obtains an amended clearance. . . .
(b) Except in an emergency, no person may, in an area in which air traffic control is exercised, operate an aircraft contrary to an ATC Instruction."[8]
Moreover, testimony from two licensed pilots, Fitch and Piper corroborates the obligativeness of the local controller's instructions. Also, the above provisions exception for an emergency cannot be invoked when the emergency situation was, as previously indicated, unbeknowst to the occupants of the Cessna.[9]
The plaintiff's second charge of negligence was the Government's failure to warn the Cessna and Ozark crews of an impending emergency. The pertinent duties of the air traffic controller are set out in the FAA Terminal Air Traffic Control Handbook 7110.8[10] and provide:
EMERGENCY DETERMINATIONS:
When you believe an emergency exists or is imminent, select and pursue a course of action which appears to be most appropriate under the circumstances and which most nearly conforms *1001 to the instructions in this manual. If you are in doubt that a given situation constitutes a potential emergency, handle it as though it were an emergency.
NOTE  Because of the infinite variety of possible situations, specific procedures cannot always be prescribed for every situation which might be considered an emergency. As a rule of thumb, an emergency includes any situation which places an aircraft in danger; i. e., uncertainty, alert, being lost, or in distress.[11]
WARNING SIGNAL:
Direct a general warning signal to aircraft or vehicle operators, as appropriate, when:
(a) Aircraft are converging and a collision hazard exists.
(b) Mechanical trouble exists of which the pilot might not be aware.
(c) Other hazardous conditions are present which call for intensified pilot or operator alertness. These conditions may include obstructions, soft field, ice on the runway, etc."[12]
Furthermore, the duties of an FAA controller is not circumscribed within the narrow limits of the aforementioned manuals. Hartz v. United States, 387 F.2d 870, 873 (5th Cir. 1968).
This Court finds that in accordance with the above cited regulation the air controllers had a duty to warn the crews of both aircraft of the emergency situation. The Government defends any breach of that duty with the three traffic advisories communicated. As to the sufficiency of these advisories, the case of United States v. Furumizo, 381 F.2d 965 (9th Cir. 1967), is relevant. There, air controllers gave warning to a Piper not to take off immediately behind a departing DC-8 because of wake turbulence. However, in apparent disregard of that warning, the Piper took off and crashed. The Government argued that the regulations and manuals only required them to issue a cautionary warning with the clearance to take off. The Court in holding the Government liable found a duty to act on the part of the controller even after the warning.[13] Just as the controllers there had a duty to stop the Piper after they issued a warning, the same duty existed in the case at bar, when, after the local controller gave traffic advisories, the controllers saw or should have seen the collision course.
In addition Furumizo refers to a rule promulgated in the Restatement of Torts (second) § 321:
"Duty to Act When Prior Conduct is Found to be Dangerous.
(1) If the actor does an act, and subsequently realizes or should realize that it has created an unreasonable risk of causing physical harm to another, he is under a duty to exercise reasonable care to prevent the risk from taking effect.
(2) The rule stated in Subsection (1) applies even though at the time of the act the actor has no risk.
Comment:
a. The rule stated in Subsection (1) applies whenever the actor realizes or should realize that his act has created a condition which involves an unreasonable risk of harm to another, or is leading to consequences which involve such a risk. The rule applies whether the original act is tortious or innocent. If the act is negligent, the actor's responsibility continues in the form of a duty to exercise reasonable care to avert the consequences which he recognizes or should recognize as likely to follow. But even where he has had no reason to believe, at the time of the act, that it would involve any unreasonable risk of physical harm to another, he is under a duty to exercise *1002 reasonable care when, because of a change of circumstances, or further knowledge of the situation which he has acquired, he realizes or should realize that he has created such a risk."[14]
Accordingly, upon the realization that he had or should have had that the instruction to "proceed straight on across the final" created an unreasonable risk of causing physical harm to the occupants of the Cessna, the air controllers were under a duty to exercise reasonable care to prevent the risk from taking effect. This duty existed whether the aforesaid instruction was tortious or innocent.
The Government, in an attempt to obviate the duty of the air controller's communicating some type of emergency warning to the aircraft argue that with the response of the Cessna at 1756:58, "SIX NINE GOLF, ROGER," . . the air controllers assumed that the term "Roger" meant that the Cessna had observed the DC-9. For the interpretation of the term "Roger" the Court looks to the Government's Exhibit 6, "Airman's Information Manual",[15] under the Chapter 1 heading "Radio-telephone Phraseology and Techniques", which states in part:
Procedure Words and Phrases
 1. The following words and phrases should be
used where practicable in radiophone communications:
 Word or Phrase Meaning
 . . . . . . .
 ROGER "I have received all of your
 last transmission" (To acknowledge
 receipt, shall not
 be used for other purposes).[16]
Consequently, in view of the proper denotation of the word "Roger", the aircontroller dangerously and inappropriately felt "confident" that the Cessna had the DC-9 in sight.[17] Also supportative of the position that the controllers should have provided emergency warning, particularly with the nebulous meaning attached to the term "Roger" is the case Stork v. United States, 430 F.2d 1104 (9th Cir. 1970). Therein, a charter aircraft took-off and crashed during a below minimum visibility period in violation of FAA regulations. Notwithstanding the regulations, the pilot requested and was granted from the controllers a clearance for take-off. The Government argued that a warning was not required when it is apparent that the pilot is in possession of all the facts known to the controllers. The Court in holding the Government liable for its silence, stated in part:
As we have noted, however, warning here would have served to remove any ambiguity that might otherwise have attached to an unqualified grant of clearance. Further, even assuming that the pilot is aware of the fact that clearance talks only in terms of traffic, his apparent knowledge will not obviate the need for warning when he is proceeding in the face of extreme danger known to the tower.[18]
In juxtapositioning the Stork case with the present case, there clearly existed a duty on the part of the air controllers to clear up any ambiguities present after the traffic clearance to the Cessna was *1003 "Rogered." In Stork it was apparent that the pilot was in possession of all the facts known to the controllers, yet a duty to warn was found existent, a fortiori, here, where it was not apparent that the occupants of the Cessna were in possession of all the facts known to the controllers, a correlative duty to warn existed.
In summary, taking in light the applicable duties of air controllers, this Court finds that the air controllers did breach their duty to warn.
The Government in its brief enumerates in what respects the pilots of Cessna N8669G were contributorily negligent. The salient acts of negligence are: operation of an aircraft so close to another aircraft as to create a collision hazard; that the pilots of the Cessna without notice to the control tower made a right turn violating their clearance to fly straight across and by so doing cut in front of the DC-9 in violation of its right-of-way; and the pilots of Cessna failed to keep a proper lookout. This Court finds all these allegations of negligence too meretricious.
The argument that the pilots of the Cessna were negligent in operating their aircraft so close to another as to create a collision hazard is a bootstrap one. The Government cannot instruct the pilots of an aircraft to proceed on a collision course and then argue that they were negligent in so doing.
The second argument of the Government that the Cessna made an unauthorized right turn which was in violation of another aircraft's right-of-way and was an unreported deviation from a clearance is unsupported by credible evidence. The Court recognizes that two air controllers testified that they saw the Cessna go into a right turn after accepting a clearance to fly straight across. However, their testimony is overborn by the wealth of testimony by uninterested observers on the ground and aboard Ozark 965, and the latter must be given credence.
In the Government's third argument, that the pilots of the Cessna failed to keep a proper lookout, the applicability of United States v. Miller, 303 F.2d 703 (9th Cir. 1962) is urged.[19] Therein, a Beechcraft piloted by the plaintiffs' deceased, Miller, was descending in a turning left bank and collided in mid-air with a Cessna, from the Cessna's left, as the Cessna had almost completed a right turn. The district court found the air traffic controller, who could have seen the aircraft for about 18 to 24 seconds prior to the crash, had he looked up, negligent and found that Miller was not contributorily negligent. Afterwards, the Ninth Circuit reversed and held that Miller was contributorily negligent as a matter of law. The Court rejected the theory of plaintiffs that the background camouflage effect limited visibility so as to constitute an exception to the right-of-way rule which the plaintiff violated because such limitation could have been removed by "a momentary bank or roll in the opposite direction."[20] However, this dicta of Miller is not applicable here. The fact situation in the case at bar is clearly distinguishable. In Miller, only the Beechcraft was cleared to enter a right traffic pattern, whereas here, the controllers cleared both aircraft for a collision course. In Miller, the Cessna clearly had the right-of-way as it was to the right of and was being overtaken by the Beechcraft. In contrast here, though the Ozark arguably had a landing right-of-way, the Cessna was to the right and was being overtaken. In Miller, the air controllers did not see the Beechcraft for 18 to 24 seconds prior to the collision. *1004 Here, the air controllers had both aircraft in view up to 50 seconds prior to the collision with one controller watching the Cessna with binoculars for about that same length of time. In Miller, it was argued by plaintiffs that Miller could not see the Cessna because of ground camouflage or a left banking maneuver. In the instant case, it was physically impossible to see the above approaching Ozark due to the Cessna's high wing structure. Under these facts this Court cannot find that the pilots of the Cessna were contributorily negligent as a matter of law.
Assuming, arguendo, that the plaintiffs' decedents were negligent, then the humitarian doctrine would be appropriate as against the air controller to negate such negligence.[21] The Missouri humanitarian doctrine would be applicable.[22] The first element is "plaintiff was in a position of imminent peril."[23] The zone of imminent peril in the instant situation commenced when the air controllers saw, or could have seen by the exercise of ordinary care, that the pilots of the Cessna approaching the path of the Ozark were oblivious to the danger and were intent on crossing its path. Frandeka v. St. Louis Public Service Co., 361 Mo. 245, 234 S. W.2d 540, 547 (1950). The evidence shows that both aircraft were visible to the air controllers for a period of approximately fifty seconds, that the Cessna maintained a constant southeast heading and would pass over the extension of Runway One Seven, that the path of the Ozark would be lined up with the extension of Runway One Seven, and that the airspeed of the Ozark was 172 knot at 41 seconds prior to collision and decreasing and the airspeed of the Cessna was approximately a constant 100 M.P.H. The evidence further shows that the cab coordinator who was watching the Cessna through binoculars was aware that the Ozark would be above and following the extension of Runway One Seven. Under the law it is only necessary that the circumstances be such that there is a reasonable chance that the plaintiff was inattentive or oblivious. Womack v. Missouri Pac. R. R., 337 Mo. 1160, 88 S.W.2d 368 (1935).[24] This Court finds that the plaintiff was in a position of immediate peril.
The second element is whether the defendant knew or using ordinary care could have known of the plaintiff's position of immediate danger. This element is explained in Lane v. Wilson, 390 S.W. 2d 943 (Spfld.Ct.App.1965):
"[w]hether and when one becomes chargeable with notice that another is in a position of imminent peril depends upon the reasonable appearance of the situation confronting him. . . . Hence, what constitutes a position of imminent peril varies according to and must be determined in light of the facts and circumstances of each particular case."[25]
This Court finds that with the vigilance which is incumbent upon air controllers, be it actual or chargeable, and their cognizance of the paths of the aircraft, the defendant knew or by using ordinary care could have known of the plaintiffs' position of immediate danger.
The third element is that defendant had enough time so that by using the means available to him and with reasonable safety to himself and all others he could have avoided injury to the plaintiff. There can be but little doubt that an emergency instruction prior to the collision could have averted the disaster. The Government urges that the traffic advisories were sufficient. However, as *1005 already indicated we find that these mere advisories before an emergency and impending collision were insufficient.
For the fourth element the Court finds that the air controllers failed to exercise ordinary care to avert the impending decision in that they failed to issue a proper emergency warning. Therefore, as a result of the aforesaid act of omission, the plaintiffs' decedents were killed.

Liability of Ozark Airlines, Inc.
The primary thrust of the Allen plaintiffs' allegation of negligence on the part of Ozark is that the crew of Ozark 965 failed to keep a proper lookout. The evidence presented to this Court corroborates this assertion. On the day of the accident, visibility was fifteen miles and Visual Flight Rules were in effect. Four Ozark passengers seated on the right side[26] of the plane saw Cessna N8669G prior to collision. Witness Bivens stated he first saw the Cessna flying to the right and below the Ozark 1½ to 2 minutes prior to the collision. Witness Basore, a licensed pilot,[27] testified that he initially sighted the Cessna approximately ¾ of a mile away from the point of impact. Witness Sims testified that he first saw the Cessna approximately 45 seconds before the collision. Witness Theisen stated that he also noticed the Cessna about 25 seconds prior to collision. The pilot of Ozark 965, Captain Fitch, testified that the ability of the crew to observe other aircraft below the Ozark was about the same as the passengers. Also, plaintiffs' expert witness, Ralph Piper, states that the Cessna would have been visible to the Ozark crew for approximately two minutes prior to the point of collision.
Not only could the Ozark crew have seen the Cessna before that last moment sighting, but they should have been particularly alerted for it in lieu of the traffic warnings communicated by local control. At 1756:31, 41 seconds prior to the collision, a traffic advisory was given indicating that there was a Cessna ahead and to the right or left. Moreover, as the Ozark was approaching the heavily trafficked area surrounding a major airport during a busy hour of the day, the crew should have been especially attentative.
The liability of Ozark Airlines, Inc., is to be determined by the law of Missouri[28] applicable to torts on land,[29] Hough v. Rapidair, Inc., 298 S. W.2d 378, 382 (Mo.1957); reaffirmed in Bledsoe v. Northside Supply and Development Co., 429 S.W.2d 727 (Mo.1968). The appropriate standard of care for the operation of an aircraft is prescribed by the common law principles of negligence. Hough v. Rapidair, Inc., supra; Linam v. Murphy, 360 Mo. 1140, 232 S.W.2d 937 (1950).
The law of Missouri places operators of motor vehicles under a duty to maintain a lookout ahead and laterally, Harris v. Lane, 379 S.W.2d 635 (St. L.Ct.App.1964); Evett v. Corbin, 305 S.W.2d 469 (Mo.1957) and they must be held to have seen what looking would *1006 have revealed. Evett v. Corbin, supra. Following the aforecited Missouri Statute, § 305.040, such duty would be equally applicable to the operators of aircraft.[30] Moreover, the Federal Aviation Administration states in its subpart on flight rules that "vigilance shall be maintained by each person operating an aircraft so as to see and avoid other aircrafts in compliance with this section."[31] Ergo, this Court finds after considering all the evidence that the crew of Ozark 965 failed to maintain a proper lookout and thus was negligent.
One of the alternative thrusts of the Allen plaintiffs' case is the humanitarian doctrine. Defendant Ozark Airlines, Inc., contends that the duty to keep a proper lookout is a two edged sword and that plaintiffs' deceased, was contributorily negligent in his failure to see Ozark 965. The testimony and evidence discloses that Cessna N8669G was of a high wing structure, thus disabling the visibility of its occupants as to aircraft behind and higher in altitude. The course of the Ozark was above and behind the Cessna just prior to the collision. Therefore, the Ozark was approaching the collision point from the Cessna's "blind spot".[32] This type fact situation invoked the humanitarian doctrine.
Again, both the law of Missouri[33] and its land tort law[34] are appropriate. The Missouri humanitarian doctrine is applicable to the common law principles of negligence and to ordinary care. Toomey v. Wells, supra; Banks v. Morris & Co., 302 Mo. 254, 257 S.W. 482 (1924), therefore, it will be considered in this action. The elements of a humanitarian case were first set out in Banks v. Morris & Co., 302 Mo. 254, 257 S.W. 482 (Mo. en banc 1924) as:
(1) plaintiff was in a position of peril;
(2) defendant had notice thereof (if it was the duty of defendant to have been on the lookout, constructive notice suffices);
(3) defendant after receiving such notice had the present ability, with the means at hand, to have averted the impending injury without injury to himself or others;
(4) he failed to exercise ordinary care to avert such impending injury; and
(5) by reason thereof plaintiff was injured.[35]
The first element, that "plaintiff was in a position of peril", has recently been redescribed as "plaintiff was in a position of immediate danger" or "imminent peril."[36] The parry of the defendant Ozark Airlines Inc., is that whenever the Cessna reached the point of imminent peril, Ozark 965 no longer had the ability to have avoided the collision. *1007 However, this Court finds that the defendant Ozark's view of "imminent peril" is an unduly restrictive one. The zone of imminent peril commences when the operator or aeronauts saw, or could have seen by the exercise of ordinary care, that the person approaching the path of his vehicle or aircraft was oblivious to the danger and was intent on crossing his path. Frandeka v. St. Louis Public Service Co., supra. The evidence indicates that for a period of 1½ to 2 minutes the Cessna was visible to the Ozark crew. If, after watching the Cessna for a minute, it appeared that the Cessna was heading on a collision course, then it would be reasonable to assume that the decedents were oblivious or inattentive. It is well settled that it is not necessary that the circumstances be such as to convince the defendant that the plaintiff was inattentive or oblivious, as stated in Womack v. Missouri Pac. R. C., supra:
It is enough that the circumstances are such as to indicate a reasonable chance that this is the case. Even such a chance that the plaintiff will not discover his peril is enough to require the defendant to make a reasonable effort to avoid injuring him.[37]
This Court finds that the plaintiff was in a position of immediate peril.
The second element is concerned with whether the defendant knew or by using ordinary care could have known of the plaintiff's position of immediate danger.[38] This element has been previously decided by the Court. The evidence clearly and cogently shows that had the Ozark crew been properly maintaining a lookout, the imperiled position of the Cessna would have been readily apparent.
After disposition of the first two elements: that the Cessna was in a position of imminent peril and defendant Ozark could have known of it; we are confronted with the crux of Ozark's opposition to the humanitarian doctrine in that Ozark 965 upon the realization of the imminent peril position of the Cessna no longer had the ability to avoid the collision. This Court cannot abide by such a supposition. The zone of imminent peril varies with the facts in each particular case. Brown v. Alton R. Co., 236 Mo.App. 26, 151 S.W.2d 727 (K.C. Ct.App.1941) and at most it can be said to be an imprecise quantum without a requirement of fine accuracy as to time, distances, feet and seconds. Wright v. Osborn, 356 Mo. 382, 201 S.W.2d 935 (1947); Perkins v. Terminal Railroad Association of St. Louis, 340 Mo. 868, 102 S.W.2d 915 (Mo. en banc 1937). But certainly it is a more expansive one than the belated last second sighting of the Ozark pilot. The record shows that the Ozark was capable of increasing its altitude approximately 200 feet within two seconds. It would be untenable to dispute that a mere two second period would not have been encompassed by the zone of imminent peril. More likely a period greater in time than that could justifiably be within the zone, but a two second elevation increase would have adequately prevented the disaster. This Court finds that the Ozark crew had the present ability to have averted the collision. Also, such aversion could have been accomplished with reasonable safety to the Ozark aircraft, its crew and passengers and all others.
Further, the Court finds that the crew of Ozark failed to exercise ordinary care to avert the impending collision in that, as previously stated, they failed to keep a proper lookout.
The other defense of Ozark Airlines, Inc., is that Ozark 965 had the right-of-way because it was on final approach and could not lose its priority with Cessna N8669G cutting in front.[39] *1008 The relevant evidence shows that at 1756:31, St. Louis local control gave Ozark a sequence to land on Runway One Seven following another Cessna (not the one here). Thereafter, at 1756:43, local control told Cessna N8669G to proceed straight on across the final and enter a left base leg for Runway One Seven. Testimony from ground observers and Ozark 965 passengers indicate that the Cessna did proceed straight on across final. In the opinions of Russell Finch, pilot of Ozark 965, and Ralph Piper, plaintiffs' expert witness, the Cessna's flight path was in compliance with the instructions to proceed straight on across final. Therefore, this Court finds that the Cessna did not cut in front of the Ozark so as to gain the right-of-way advantage.
As indicated, Ozark 965 was sequenced for landing on Runway One Seven after a clearance from local control. The applicable FAA flight rule, 14 C.F.R. § 91.67(f) gives an aircraft on final approach the right-of-way.[40] In this respect the Ozark was properly following its clearance to proceed to final approach. However, a clearance did not relieve the Ozark crew from its duty to maintain a vigilant lookout.[41] In Hochrein v. United States, 238 F.Supp. 317 (E.D.Pa.1965), a case involving a midair collision between a Cessna 140 and a Aeronca where the Cessna was given a clearance to enter the traffic pattern, it was said that: "[d]ecedent Hochrein was required to follow his clearance, not blindly, but correlative with his duty to exercise care for his own safety from everything of which he was aware."[42] Here, the Ozark crew had been given traffic advisories and should have exercised care in proceeding with their clearance.
Defendant Ozark Airlines, Inc., urges the applicability of Hough v. Rapidair, Inc., 298 S.W.2d 387 (Mo.1957) to the present action. That case involved a Swift aircraft, the plaintiff, who was on final approach for landing and defendant's J-3, which approached the Swift on the left also for the purpose of landing. It was held that the plaintiff's Swift had the right-of-way in accordance with a rule comparable to 14 C.F.R. § 91.67(f). However, two important distinctions exist between the Hough case and the instant action. In Hough, the plaintiff's Swift also had the right-of-way in accordance with a rule comparable to 14 C.F.R. § 91.65(c)[43] as the *1009 Swift was approaching from the right of the J-3. Whereas, here, the Cessna was approaching from the right. Moreover, in the Hough case, the J-3 cut in front of the Swift on final approach. Here, in comparison, the Cessna was maintaining a constant course in compliance with the control tower and did not cut in front of the Ozark.
In summary, even though the Ozark arguably had the right-of-way, such cannot be considered a wholesale license to proceed without careful surveillance of its approach path and to do so without vigilance was a negligent omission.
In consequence, the Court concludes that the concurrent negligence of the air traffic controllers and the crew of the Ozark 965 directly caused or combined to cause the deaths of Allen and Williams.

Damages
Under the Federal Torts Claim Act, 28 U.S.C. 2671 et seq. damages are determined by the law of the state where the tortious act was committed, Hatahley v. United States, 351 U.S. 173, 76 S.Ct. 745, 100 L.Ed. 1065 (1956), therefore, the law of Missouri is appropriate. The Missouri Wrongful Death Action, RSMo 537.070 (1969), V.A.M.S. is applicable as an action for wrongful death is based on the statute of the place where the injury occurred that caused the death. Richards v. United States, 369 U.S. 1, 82 S.Ct. 585, 7 L.Ed. 2d 492 (1962). Under this statute the amount of recovery for the surviving parties is limited to fifty thousand dollars. RSMo 537.090 (1969), V.A.M.S.[44]
After the initial separate filing of the plaintiffs' complaints, the United States filed a third party complaint as against Ozark Airlines, Inc., for contribution or indemnification.[45] Thereafter, the Allen plaintiffs amended their complaint to include Ozark as a defendant, but the Williams plaintiff did not. Following State v. Dinwiddie, 358 Mo. 15, 213 S.W.2d 127 (1948), it is clearly optional with the plaintiff whether he will accept the third-party defendant as a defendant in the case. In effect, Ozark was alleged to be a joint tort-feasor by the Allen plaintiffs, whereas, Ozark was not accepted as such, but remained a third-party defendant under the United States' complaint and is only liable if the claim for contribution or indemnification by the Government is proper.
It is axiomatic under Missouri law that there is no contribution as between joint tort-feasor, but only judgment debtors. RSMo 537.060 (1969), V.A.M.S.; May v. Bradford, 369 S.W.2d 225 (Mo.1963). The Allen plaintiffs' amended complaint seeks judgment against the United States and Ozark Airlines, Inc., as joint tort-feasors for their independent concurrent acts.[46] As previously stated, the defendants directly caused or combined to cause the deaths of Allen and Williams, therefore such defendants are jointly and severally liable to the Allen plaintiff.
In the Williams suit only the Government is properly liable. The Government's third party claim for contribution and indemnification is specious. As indicated, only judgment debtors are allowed contribution and such could only exist if the Williams plaintiffs would have accepted Ozark as a defendant (joint tort-feasor). Moreover, indemnification does not lie as stated in State ex rel. Siegel v. McLaughlin, *1010 315 S.W.2d 499 (St.L.Ct.App. 1958):
"[i]n the case of concurrent or joint tortfeasors, having no legal relation to one another, each of them owing the same duty to the injured party, and involved in an accident in which the injury occurs, there is complete unanimity among the authorities everywhere that no right of indemnity exists on behalf of either against the other; in such a case, there is only a common liability and not a primary and secondary one, even though one may have been very much more negligent than the other."[47]
Indemnification in Missouri is a circumscribed right in tort cases. It is allowed "in favor of one who is held responsible solely by imputation of law because of his relation to the actual wrongdoer . . .," McDonnell Aircraft Corp. v. Hartman-Hanks-Walsh Painting Co., 323 S.W.2d 788 (Mo.1959), "or in favor of one who has only a secondary duty as contrasted with that of the original and primary wrongdoer", Crouch v. Tourtelot, 350 S.W.2d 799 (Mo.1961). Third-party plaintiff U.S. Government, and third-party defendant, Ozark, are not contractually related nor are they in a special legal relationship. Neither can it be said that the Government's duty was a secondary one. Ergo, in the Williams case only the Government is liable.
The wrongful death damage prayer for the statutory limit of $50,000 by both sets of plaintiffs is convincingly supported by the evidence. The decedent, Bobby Lee Allen, age 32, sole support of a wife and 3 young children with an income in preceding years of approximately $7,300 per year, would have earned well in excess of the statutory amount. Similarly, the decedent John Brooks, age 34 sole support of a wife and 3 young children with an income in previous years of over $20,000, would also have earned well in excess of the statutory limit. Accordingly, both sets of plaintiffs shall be entitled to their prayed for amount.
NOTES
[1] The crew chief testified that he used the binoculars intermittently until collision. (T. 450).
[2] Local Controller Marchbanks, cross examination (T. 554).

Q. Did you at anytime see the Cessna 150 deviate from the instructions that you gave him to proceed straight across the final?
A. No, sir, I didn't.
Q. That path led him into collision with the Ozark, did it not?
Mr. Dombroff (U. S. Att'y): I'm going to object to that, your Honor.
The Court: Overruled.
A. According to my observation?
Q. Yes sir.
A. According to my observation, yes, but I thought he was clear of that path.
It should also be noted that in the opinion of Russell Fitch, Captain of the Ozark, and Ralph Piper, plaintiff's expert witness, the flight path of the Cessna was in compliance with the above instruction to "proceed straight across the final."
[3] Published pursuant to 14 CFR § 65.45(a).
[4] Handbook, supra at 5.
[5] Id. at 25.
[6] Id. at 28.
[7] Cattaro v. Northwest Airlines, Inc., supra, at 895.
[8] 14 C.F.R. § 91.75 (1968). This regulation was in effect at the time of the collision.
[9] The Ozark was in the blindspot of the Cessna.
[10] Pursuant to 14 C.F.R. § 65.45(a). Such handbook was in effect at time of the collision.
[11] Handbook 7110.8, Chapter 6, § 1, "Emergencies and Special Notification", par. 835.
[12] Id. Chapter 3, § 2, "Traffic Information and Signals", par. 271.
[13] United States v. Furumizo, supra, at 968.
[14] Missouri in Zickefoose v. Thompson, 327 Mo.App. 690, 157 S.W.2d 259 (Sprfld. C.A. 1941) supported the principle of a duty to avert the consequences of an act which was originally negligent.
[15] Published for the Department of Transportation Federal Aviation Administration, February, 1968. Such was in effect at time of the collision.
[16] Id. at 1-24. In their reply brief, the plaintiffs cite the FAA Terminal Air Control Handbook 7110.8, which provides:

79. Words and Phrases
Use the following words or phrases in radio-telephone and interphone communication, as appropriate:
. . . . .
ROGER  `I have received all of your last transmission.' (to acknowledge accept; do not use for any other purpose).
. . . . .
WILCO  USN `I have received your message, understand it, and will comply.'
[17] The Court after having heard copious conflicting evidence as to the proper meaning of the term "Roger", finds resolution via the aforecited "Handbooks" as provided by the plaintiffs and defendant Government.
[18] Stork v. United States, supra, at 1108.
[19] The Court also notes the Governments assertion that the case of Hamilton v. United States, 343 F.Supp. 426 (N.D.Cal.1971) is applicable. The following reasoning by the Court shall also be applied to the Hamilton case.
[20] United States v. Miller, supra, 303 F.2d at 709. The ratio decidendi in Miller was that the violation of the right-of-way rules was negligence which barred his recovery.
[21] See Sawyer v. United States, 297 F.Supp. 324 (E.D.N.Y.1969), wherein, it was said that the doctrine of last clear chance would be proper as against air traffic controllers but not under that fact situation.
[22] See footnotes 28 and 29 infra and accompanying text. Toomey v. Wells, 310 Mo. 696, 276 S.W. 64 (1925). See elements of a humanitarian case at text accompanying footnote 35 infra.
[23] See footnote 36 infra.
[24] See text accompanying footnote 37 infra.
[25] Lane v. Wilson, supra at 947.
[26] The side where the collision occurred.
[27] Federal Courts place special credence in such passengers for determination of whether a crew performed in a negligent manner. American Airlines, Inc. v. United States, 418 F.2d 180, 192 (5th Cir. 1969); Ingham v. Eastern Airlines, Inc., 373 F.2d 227, 230 (2nd Cir. 1967).
[28] § 305.050, RSMo 1969, V.A.M.S.: Laws of state to govern

All crimes, torts and other wrongs committed by or against an aeronaut or passenger while in flight over this state shall be governed by the laws of this state; and the question whether damage occasioned by or to an aircraft while in flight over this state constitutes a tort, crime or other wrong by or against the owner of such aircraft shall be determined by the laws of this state.
[29] § 305.040 RSMo 1969, V.A.M.S.:

Liability of aircraft owner determined by tort law
The liability of the owner of one aircraft to the owner of another aircraft, or to aeronauts or passengers on either aircraft, for damage caused by collision on land or in the air shall be determined by the rules applicable to torts on land.
[30] In Ahmann v. United Airlines, Inc., 313 F.2d 274 (8th Cir. 1963), an identical Arizona statute was involved and was interpreted to impose a duty on aeronauts to keep and maintain at all times a lookout. See also Cattaro v. Northwest Airlines, Inc., 236 F. Supp. 889, 894 (E.D.Va.1964) and United Airlines, Inc. v. Wiener, 335 F.2d 379, 389 (9th Cir. 1964).
[31] 14 C.F.R. § 91.67(a) (1968).
[32] Witness Thiesen, a passenger aboard Ozark 965 stated that he did not think the occupants of the Cessna saw the Ozark at any time prior to the collision. Witness Basore, the pilot passenger, testified that he doubted if the occupants of the Cessna could have observed the Ozark. Also plaintiff's expert witness testified that in his opinion the occupants of the Cessna would not have seen the Ozark prior to the collision.

Decedents in Missouri are presumed to have exercised due care for their own safety. Lyon v. Southard, 323 S.W.2d 785, 788 (Mo. 1959). Pilots killed in collision of aircraft are presumed to have acted with diligence and due care. Eastern Airlines v. Union Trust, 95 U.S.App.D.C. 189, 221 F.2d 62 (1955).
[33] See footnote No. 28, supra.
[34] See footnote No. 29, supra.
[35] Banks v. Morris Co., supra, 257 S.W. at 484.
[36] Missouri Approved Jury Instructions, 17.04 2d ed. (1969); Elam v. Allbee, 432 S.W. 2d 379 (St.L.C.A.1968). In the Committee's Comments to Verdict Director No. 17.04 it is noted that "immediate danger" means "imminent peril."
[37] Womack v. Missouri Pac. R. C., supra, 88 S.W.2d at 371.
[38] Missouri Approved Jury Instructions, 17.04 2d ed. (1969).
[39] The facts are unclear as to whether Ozark 965 was on final approach. The local controller testified that Ozark 965 was never given a clearance to land, but was given only a sequence to land. We shall assume arguendo here, that a sequence to land is tantamount to a final approach.
[40] 14 C.F.R. § 91.67 (1968)

(f) Landing. Aircraft, while on final approach to land, or while landing, have the right of way over other aircraft in flight or operating on the surface. When two or more aircraft are approaching an airport for the purpose of landing, the aircraft at the lower altitude has the right of way, but it shall not take advantage of this rule to cut in front of another which in on final approach to land or to overtake that aircraft.
[41] United States v. Miller, 303 F.2d 703 (9th Cir. 1962); in United States v. Schultetus, 277 F.2d 322 (5th Cir. 1960), the Court quoted Speizer, Preparation Manual for Aviation Negligence at 397: "In this connection a clearance issued by a tower (such as `cleared to land') either by radio or visual signal is permissive in nature and does not relieve the pilot from exercising a reasonable degree of caution in executing the provision of clearance." Also see New York Airways, Inc. v. United States, 283 F.2d 496 (2nd Cir. 1960); Khourey v. American Airlines, Inc., 170 Ohio St. 310, 164 N.E.2d 402 (1960).
[42] Hochrein v. United States, supra, 238 F. Supp. at 319.
[43] 14 C.F.R. § 91.65(c) (1968)

(c) Converging. When aircraft of the same category are converging at approximately the same altitude (except headon, or nearly so) the aircraft to the other's right has the right of way. If the aircraft are of different categories 
(1) a balloon had the right of way over any other category of aircraft;
(2) a glider has the right of way over an airship, airplane or rotorcraft; and
(3) an airship has the right of way over an airplane or rotorcraft.
However, an aircraft towing or refueling other aircraft has the right of way over all other engine-driven aircraft.
[44] This statute has been amended to allow unlimited recovery effective September, 1973. However, the former statutory limit is applicable here.
[45] Missouri's substantive law on third-party practice would be controlling. Kuhn v. Yellow Transit Freight Lines, 12 F.R.D. 252 (E.D.Mo.1952).
[46] The aforesaid defendants are properly denominated as "joint tort-feasors," such term being defined as parties causing wrongful acts which are separate and distinct but concur in point of time and directly cause a single injury. Mails v. Kansas City Public Service Co., 51 F.Supp. 562, 564 (W.D.Mo. 1943).
[47] State ex rel. Siegel v. McLaughlin, supra, 315 S.W.2d at 507-508.